IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| INDUSTRIAL ENVIRONMENTAL SERVICES, LLC, an Oklahoma LLC; and MIKE WILLIAMS, Individually and as Managing Member of INDUSTRIAL ENVIRONMENTAL SERVICES, LLC, an Oklahoma LLC, | § § § § § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No 1:07-CV-178-C |
| WORLD INVESTMENT GROUP LLC (a Delaware LLC); DANIEL H. WILKS; FARRIS WILKS; WILLIAM BARKER; and FRANKLIN AUTRY, all Individually and as members of World Investment Group LLC (a Delaware LLC) | § § § § § § § § § | |
| (a Delaware LLC), | § § | |
| Defendants. | § | |

COUNTER-CLAIMANT WORLD INVESTMENT GROUP, LLC'S
SECOND AMENDED COUNTERCLAIMS

TO THE HONORABLE JUDGE SAM R. CUMMINGS:

Counter-claimant World Investment Group, LLC ("World Investment Group") respectfully files Its Second Amended Counterclaims against Industrial Environmental Services, LLC ("Industrial Environmental") and Mike Williams ("Williams") in accordance with the Court's Order dated July 18, 2008. In support thereof, World Investment would respectfully show the Court the following:

965733_1

## I.
## WORLD INVESTMENT GROUP'S SECOND AMENDED COUNTER-CLAIMS

**A.     Parties.**

1.      Counter-Claimant is World Investment Group.  World Investment Group is a Delaware limited liability company with its principal place of business in Texas.

2.      Counter-Defendants are Industrial Environmental and Williams.  Industrial Environmental is an Oklahoma Limited Liability Company with its principal place of business in Oklahoma.  Williams is an individual residing in Oklahoma.

**B.     Jurisdiction and Venue.**

3.      This Court has asserted jurisdiction over this claim under 28 U.S.C. 1332(a)(1).  The amount in controversy of World Investment Group's counterclaim exceeds $75,000, and Industrial Environmental has represented to this Court there is complete diversity of citizenship.

4.      Venue is proper in this district under 28 U.S.C. § 1391.

**C.     Factual Background.**

5.      In 2006, Industrial Environmental – through its sole member Williams – approached World Investment Group regarding the potential sale of Industrial Environmental's 170 Chem Source units.  World Investment Group presented Mike Williams with a $4,500,000 offer for Industrial Environmental's 170 Chem Source units. This offer was rejected by Williams and Industrial Environmental.

6.      After rejecting World Investment Group's offer, Williams informed World Investment Group that Industrial Environmental would sell its 170 Chem Source units for

$6,000,000.   This offer was accepted by World Investment Group based on representations made by both Williams and Industrial Environmental regarding the value of Industrial Environmental's 170 Chem Source units.   Williams and Industrial Environmental now claim the offer they presented to World Investment Group was an incorrect assessment of value.

7.    Williams was founder and President of Chem Source's wholly-owned subsidiary, Industrial Environmental.  By virtue of this position, Williams and Industrial Environmental had unfettered access to the actual financial statements, customer lists, and asset lists of both Chem Source and Industrial Compounding.   Williams and Environmental also had access to Chem Source's president, Joe Jacobi, regarding financial status of Chem Source.  As such, Williams and Industrial Environmental were able to accurately assess – and misrepresent – the monetary value of Industrial Environmental's 170 Chem Source units.

8.    After being induced to acquire Industrial Environmental's 170 Chem Source units, World Investment Group discovered the representations made by Williams and Industrial Environmental regarding the valuation of Industrial Environmental's 170 Chem Source units were false.  That is, Industrial Environmental's 170 Chem Source units were worth far less than the $6,000,000 paid by Chem Source.  As such, World Investment Group seeks to: (1) rescind the transaction set forth in the Sale and Purchase Agreement dated August 25, 2006; or (2) recover the difference between the $6,000,000 it paid for Industrial Environmental's 170 Chem Source units and what these units are actually worth which is below $6,000,000.

**D.    Causes of Action.**

**COUNT ONE-FRAUD**

9.    World Investment Group incorporates all prior paragraphs herein by reference.

10.    Williams and Industrial Environmental misrepresented the value of Industrial Environmental's 170 Chem Source units were collectively worth $6,000,000 when they were in actuality worth less than that $6,000,000.  Williams and Industrial Environmental knew their representations regarding the value of Industrial Environmental's 170 Chem Source units were material to World Investment Group. Williams and Industrial Environmental intended for and knew World Investment Group was relying on and, if fact, did rely upon these representations.  World Investment Group was damaged by the fraud committed by Williams and Industrial Environmental.

**COUNT TWO—NEGLIGENT MISREPRESENTATION**

11.    World Investment Group incorporates all prior paragraphs herein by reference.

12.    Williams and Industrial Environmental made a material misrepresentation to World Investment Group regarding the value of Industrial Environmental's 170 Chem Source units in a transaction to which they both had, or purported to have, a pecuniary interest.  Williams and Industrial Environmental made material misrepresentations and supplied other incorrect information regarding the value of Industrial Environmental's 170 Chem Source units to World Investment Group for the guidance of World Investment Group's business.  At all times, Williams and Industrial Environmental failed

to exercise reasonable care and competence in communicating the above-referenced information to World Investment Group. World Investment Group suffered substantial pecuniary loss because it relied upon the material misrepresentations made by Williams and Industrial Environmental.

### COUNT THREE—STATUTORY FRAUD

13.   World Investment Group incorporates all prior paragraphs herein by reference.

14.   To the extent units in a limited liability company are subject to § 27.01 of the Texas Business and Commerce Code, World Investment Group asserts a statutory fraud claim. Williams and Industrial Environmental made the false misrepresentations of existing material facts as described above; (2) such representations were made for the purpose of inducing World Investment Group to enter into a contract to acquire Industrial Environmental's 170 units in Chem Source; (3) such false representations were relied upon by World Investment Group in entering the contract to acquire Industrial Environmental's 170 units in Chem Source; and (4) such representations were a proximate and/or producing cause of damages to World Investment Group. World Investment Group seeks rescission of the Sale and Purchase Agreement dated August 25, 2006 and/or other relief allowed by § 27.01 of the Texas Business and Commerce Code.

### II.
### RESCISSION

15.   World Investment Group incorporates all prior paragraphs herein by reference.

16.    In connection with its fraud claims against Industrial Environmental, World Investment Group has requested that it be awarded the equitable remedy of rescission of the Sale and Purchase Agreement dated August 25, 2006 ("Sale and Purchase Agreement").[1]   That is, World Investment Group has sought to recover the $6,000,000 it paid to Industrial Environmental in exchange for Industrial Environmental's 170 Chem Source units.  World Investment Group has only sought to rescind § 2 of the Securities Sale and Purchase Agreement because Williams and Industrial Environmental elected only to file suit against World Investment Group and its members.   Chem Source, Industrial Compounding, LLC ("Industrial Compounding"), and Theresa Williams are not necessary parties to rescind § 2 of the Securities Sale and Purchase Agreement.

17.    Section 2 of the Securities Purchase and Sale Agreement provides that: "Seller (Industrial Environmental) sells and conveys to Purchaser (World Investment Group), and Purchaser (World Investment Group) purchases from Seller (Industrial Environmental), 170 units of the Company (Chem Source).  The aggregate purchase price of the Units sold by Seller (Industrial Environmental) is $6,000,000, which Purchaser (World Investment Group) shall pay to Seller (Industrial Environmental) via a cashier's check or immediately available funds, delivered to Seller (Industrial Environmental) on or before September 10, 2006."   Chem Source and Industrial Compounding, LLC ("Industrial Compounding") are not necessary parties to such claim otherwise Williams and Industrial Environmental would have most assuredly joined all as parties to this

---

[1]   A true and correct copy of the Sale and Purchase Agreement is attached hereto as Exhibit "A."

lawsuit.  Theresa Williams (who undertook liabilities under § 6 of the Securities Purchase and Sale Agreement), Industrial Compounding, and Chem Source are not necessary parties to rescind this section of the Securities Sale and Purchase Agreement.

18.     Turning to the "status quo," World Investment Group submits there is no action World Investment needs to do other than to return 170 Chem Source units to Industrial Environmental and Industrial Environmental needs to return $6,000,000 to World Investment Group.  That is, Chem Source has not made any distributions of profit nor has it transferred any of its capital assets or accounts to any third-party.  No new Chem Source units have been issued and Industrial Compounding is still wholly owned by Chem Source – thus, there would be no dilution in Industrial Environmental's 170 Chem Source units.  The only material change affecting Chem Source is that its debt of $3,322,644 million (to which Williams and his wife Theresa Williams were beneficiaries) has been paid.  To return the parties to the "status quo," Industrial Environmental will have to have to contribute its proportionate share of this debt or it would be further unjustly enriched.  Industrial Environmental must also agreeto be bound by the terms of the Chem Source Operating Agreement dated October 1, 2004.[2]

19.     World Investment Group did not transfer any Chem Source units to Chesapeake Energy Corporation or Chesapeake Operating, Inc. (collectively "Chesapeake").  Similarly, World Investment Group did not obtain any funds from

---

[2] A true and correct copy is attached hereto as Exhibit "B."

Chesapeake from any sale of any Chem Source units.  Chesapeake has not ever nor does it now own any Chem Source units.

20.     World Investment Group is in a position to effectuate the return of 170 Chem Source units to Industrial Environmental if it recovers on its fraud claims against Industrial Environmental and Williams.

## III.
## JURY DEMAND

World Investment requests a trial by jury for all issues triable by a jury in connection with its Counterclaims.

## IV.
## PRAYER FOR RELIEF

World Investment Group respectfully prays that, in connection with its counterclaims, World Investment Group respectfully requests that Plaintiffs be cited to appear and answer and that, upon final trial, the Court award it the following relief:

a.     rescind the transaction set forth in the Sale and Purchase Agreement dated August 25, 2006, thereby providing World Investment with $6,000,000 and Industrial Environmental with 170 Chem Source units or, alternatively, award World Investment with the difference between what it paid for Industrial Environmental's 170 units in Chem Source and what these units were actually worth;

b.     award World Investment with punitive and/or exemplary damages pursuant to §41.003 of the Texas Civil Practices and Remedies Code;

c.     award World Investment its reasonable attorneys' fees and costs;

d.      award World Investment all pre- and post-judgment interests allowed by law; and

e.      award World Investment such other and further relief, general or special, at law or in equity, to which World Investment may show itself justly entitled.

Respectfully submitted,

_____s/ Derek W. Anderson_____
Marshall M. Searcy, Jr.
State Bar No. 17955500
Derek W. Anderson
State Bar No. 24012215
Chris S. Greer
State Bar No. 24048954
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas  76102
(817) 332-2500
(817) 878-9280 (facsimile)
marshall.searcy@khh.com
derek.anderson@khh.com
chris.greer@khh.com

**ATTORNEYS FOR DEFENDANTS
WORLD INVESTMENT GROUP LLC,
DANIEL H. WILKS, FARRIS WILKS
AND WILLIAM BARKER**

William A. Hicks
State Bar No. 09582000
Sharon E. Hicks
State Bar No. 18787500
P.O. Box 1587
Cisco, Texas 76437
(817) 850-1008
(817) 850-1011 (facsimile)
bhicks@fractech.net
shicks@fractech.net

**ATTORNEYS FOR DEFENDANTS
WORLD INVESTMENT GROUP LLC,
DANIEL H. WILKS, FARRIS WILKS,
AND WILLIAM BARKER**

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2008, I electronically filed the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the CM/ECF system of the Court which will send a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

John Smithee
Brian P. Heinrich
David M. Russell
Templeton, Smithee,
  Hayes, Heinrich & Russell, L.L.P.
320 S. Polk, Suite 1000
Lobby Box 5 (79101)
P.O. Box 15010(79105)
Amarillo, Texas
john@templetonsmithee.com
brian@templetonsmithee.com
david@templetonsmithee.com

Walker C. Friedman
Christian D. Tucker
Friedman, Suder & Cooke, A P.C.
Tindall Square Warehouse No. 1
604 East 4th Street, Suite 200
Fort Worth, Texas 76102
wcf@fsclaw.com
tucker@cdtlaw.com

_____s/ Derek W. Anderson_____
Derek W. Anderson

## SALE AND PURCHASE AGREEMENT

This Agreement dated effective August _25_, 2006, is made between Industrial Environmental Services, LLC, an Oklahoma limited liability company ("IES") and World Investment Group, LLC ("Purchaser"). IES is hereinafter sometimes referred to as "Seller." This Agreement shall be approved by Chem Source, LLC, Industrial Compounding, LLC ("Industrial Compounding") and Michael E. Williams, Individually ("Williams"), all of whom shall be deemed to be bound by the terms of the Agreement.

    1.   <u>Background.</u> Seller owns 170 Units of Chem Source, LLC, a Nevada limited liability company (the "Company"), which represent a membership interest in the Company.

    2.   <u>Sale/Purchase.</u> Seller sells and conveys to Purchaser, and Purchaser purchases from Seller, 170 units of the Company. The aggregate purchase price for the Units sold by Seller is $6,000,000.00, which Purchaser shall pay to Seller via a cashier's check or immediately available funds, delivered to the Seller on or before September 10, 2006.

    3.   <u>Representations/Warranties.</u>   Seller and Williams each represents and warrants to Purchaser that:

    (a)   The Seller owns the Units sold by the Seller to Purchaser pursuant to this Agreement free and clear of any lien, claim or interest adverse to Purchaser, except for any consent required of the members of the Company to the transfer of the Units pursuant to the Operating Agreement of the Company.

    (b)   Williams is the sole member of Seller and has full and complete authority to act on behalf of Seller with respect to this Agreement.

    (c)   Seller has the right and authority to convey the Units sold by Seller pursuant to this Agreement, except for any consent required of the members of the Company to the transfer of the Units pursuant to the Operating Agreement of the Company.

    (d)   Neither Seller nor Williams has entered into any transaction, or done any other act, on behalf of the Company or Industrial Compounding outside the ordinary course of the business of the Company or Industrial Compounding. Williams does not know of any transaction or other act entered into or done by any other person on behalf of the Company or Industrial Compounding outside the ordinary course of the business of the Company or Industrial Compounding.

**EXHIBIT**

**A**

CHEM/WIG 18537

(e)     Neither Seller nor Williams knows of any liability of the Company or Industrial Compounding other than liabilities incurred by the Company or Industrial Compounding in the ordinary course of business of the Company or Industrial Compounding.

(f)     Seller has been given access to such information regarding the Company as Seller has requested and has obtained such information regarding Company as Seller desires. Except for Purchaser's covenants in this Agreement, Seller is not relying on any representation, warranty or covenant from Purchaser with respect to this transaction, including the purchase price for the Units sold by Seller.

4.      Reimbursement for Tax Liability.  Purchaser shall reimburse Seller for all state and federal income tax liability that Seller incurs as the result of undistributed net profits from Company for the period from January 1, 2006 through the day before the Effective Date.  Payment shall be made on or before April 5, 2007.  The undistributed net income and tax liability shall be computed as though: (a) the taxable year of Company terminated on the day of closing; (b) on that day Company collected its collectible accounts receivable and paid its accounts payable and other expenses incurred through such date; and (c) Company deducted other expenses that are incurred through such date (such as depreciation, interest, and taxes).

5.      Effective Date.  The sale and purchase of the Units sold by Seller shall be effective as of 12:01 a.m. on the date first set forth above.

6.      Resignations.  Effective as of the Effective Date, Williams resigns from any position Williams holds as a manager, employee or officer of the Company, except that:

(a)     The foregoing shall not affect the rights and obligations of Michael E. Williams ("Williams") and Industrial Compounding under the Employment Agreement between them ("the Employment Agreement").

(b)     On or before September 10, 2006, Chem Source, LLC agrees to pay to Michael E. Williams and Theresa Williams by cashier's check or immediately available funds, the full amount of the indebtedness owed by Chem Source, LLC to them under the terms of the Securities Purchase and Sale Agreement and promissory note whereby Chem Source, LLC purchased all of Williams' right title and interest in Industrial Compounding and Williams financed a portion of the purchase price.

Upon receipt of payment, Michael E. Williams and Theresa Williams will mark the promissory note "paid in full" and release the security for the promissory note.

CHEM/WIG 18538

7.   Release. Except as otherwise specifically provided herein, and except for obligations arising out of or evidenced by documents executed by Purchaser and Seller concurrently with their execution of this Agreement, Seller and Williams each:

(a)   agrees that all agreements and any other contractual arrangements between the Company and the Seller are terminated, including all such arrangements set forth in the Operating Agreement of the Company; and

(b)   releases the Company from any claim or liability which arises out of any event occurring or any circumstance in existence on or prior to the Effective Date, whether under any prior contractual arrangement between the Company and the Seller or otherwise, and whether such claim or liability arose to the Seller by virtue of the Seller's status as a member, contractor of the Company or otherwise.

8.   Restrictive Covenants. Concurrently with the parties' execution of this Agreement, Williams and Purchaser shall execute a Restrictive Covenant Agreement in the form of that previously approved by the parties.

9.   Waiver. The failure of a party to enforce any provision of this Agreement shall not constitute a waiver of such party's right to thereafter enforce such provision or to enforce any other provision at any time.

10.   Further Assurances. The parties agree to execute such further documents and take such additional actions as may be reasonably necessary or appropriate to effectuate or evidence their agreement as set forth herein.

11.   Modification. The terms of this Agreement cannot be modified except by a written instrument signed by all parties to this Agreement.

12.   Entire Agreement. This written document, together with any other written document executed contemporaneously herewith, represents the final agreement of the parties with respect to the subject matter of this document and may not be contradicted by evidence of prior or contemporaneous oral agreements of the parties. There are no unwritten oral agreements between the parties regarding the subject matter of this document.

13.   Attorneys' Fees. The prevailing party in any suit brought to enforce or interpret this Agreement shall be entitled to recover a reasonable attorneys' fee and court and other costs in addition to any other relief awarded.

CHEM/WIG 18539

14.    Governing Law.    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF TEXAS, EXCLUDING CHOICE OF LAW PROVISIONS THEREOF.

15.    Severability.    No partial invalidity of this Agreement shall affect the remainder.

16.    Binding Effect.    This Agreement, including all representations, warranties and covenants of each party contained in this Agreement, shall be binding upon and shall inure to the benefit of each party's legal representatives, heirs, successors and assigns. The representations, warranties and covenants of Seller and Williams are also intended for the benefit of the Company and may be enforced by the Company. Purchaser's representations, warranties and covenants are also intended for the benefit of Michael E. Williams and Theresa Williams.

INDUSTRIAL ENVIRONMENTAL
SERVICES, LLC

By: _____
    Michael E. Williams, Sole Member

_____
Michael E. Williams, Individually

WORLD INVESTMENT GROUP, LLC

By: _____
    Daniel H. Wilks, Manager

7106.003/005:136582                                         Page 4

CHEM/WIG 18540

## JOINDER BY COMPANY

The Company executes this Agreement to evidence its consent and agreement to the transfer by Sellers of the Units to Purchaser and the Company's agreement to all other provisions of this Agreement applicable to the Company.

CHEM SOURCE, LLC

By:_____
Daniel H. Wilks, Manager

## JOINDER BY INDUSTRIAL COMPOUNDING, LLC

Industrial Compounding, LLC ("IC") executes this Agreement to evidence its consent and agreement to all provisions of this Agreement applicable to IC.

INDUSTRIAL COMPOUNDING, LLC

By:_____
Daniel H. Wilks, Manager

CHEM/WIG 18541

*d pm*
*06-06-05*

## OPERATING AGREEMENT

This Operating Agreement, dated effective October 1, 2004, is made and adopted by Chem Source, LLC, a Nevada limited liability company (the "Company"), with its principal office located in Tarrant County, Texas, and the following initial Members of the Company: Joseph E. Jacobi ("Jacobi"), Industrial Environmental Services, LLC, an Oklahoma limited liability company ("IES"), and World Investment Group, LLC, a Delaware limited liability company ("WI").

### Article I
### Definitions

**1.1** <u>Definitions</u>. As used in this Agreement:

"Articles" means the articles of organization of the Company filed with the Secretary of State of Nevada, as amended from time to time.

"Board of Managers" means the Manager or, if there is more than one Manager, the Managers collectively. Any reference to the Managers includes the Board of Managers.

"Capital Contribution" means as to any Member, the amount contributed to the capital of the Company by the Member.

"Code" means the Internal Revenue Code of 1986, as amended.

"Manager" means any person named in the Articles as an initial manager of the Company and any person hereafter elected as a manager of the Company as provided in this Agreement, but does not include any person who has ceased to be a manager of the Company.

"Member" means each person who holds any Units. A person who ceases to hold any Units shall cease to be a Member.

"Sharing Ratio" with respect to any Member means a fraction (expressed as a percentage), the numerator of which is the number of Units held by the Member and the denominator of which is the number of Units held by all Members.

"Unit" means, represents and evidences a Member's interest in the Company, including the right of the Member to vote, approve and consent as a Member to matters relating to the Company and the right to be allocated income, gain, loss, deduction, credit or similar items, and to receive distributions from the Company.

EXHIBIT
**B**

CHEM/WIG 18237

1.2   Other Definitions. Other terms which are defined in other provisions of this Agreement have the meanings assigned to such terms in such provisions.

1.3   Statutes. References to any statute shall include such statute as it may be subsequently amended and references to any provision of a statute shall include the corresponding provision of any other corresponding statute hereafter in effect.

Article II
Members

2.1   Actions. In exercising their right to vote, approve and consent as Members to matters relating to the Company, the Members shall act collectively through meetings, written consents in lieu of meetings or the execution by one or more Members of any document pursuant to which the action is taken or effected.

2.2   Meetings.

(a)   Annual or other regular meetings of the Members may be scheduled as the Managers may by resolution specify from time to time. Special meetings of the Members for any proper purpose or purposes may be called at any time by the Managers or the Members holding at least ten percent of the outstanding Units.

(b)   A quorum shall be present at a meeting of Members if Members holding a majority of the Units are present at the meeting. The affirmative vote of a Members holding a majority of the Units at a meeting of Members at which a quorum is present shall be the act of the Members at such meeting and shall be sufficient for all matters as to which the vote, approval, consent or other act of the Members, or a majority of the Members, is required under applicable law, the Articles or this Agreement, except for a matter, if any, as to which this Agreement requires a greater percentage.

(c)   Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten nor more than sixty days before the date of the meeting, either personally or by mail, by or at the direction of the Managers or person calling the meeting, to each Member entitled to vote at such meeting.

(d)   Each outstanding Unit shall be entitled to one vote on each matter submitted to a vote of the Members. At any meeting of the Members, each Member may vote either in person or by proxy executed in writing by the Member or by the

CHEM/WIG 18238

Member's duly authorized attorney-in-fact. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy or unless otherwise made irrevocable by law. A proxy shall be revocable unless the proxy conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Each proxy shall be filed with the secretary of the Company prior to or at the time of the meeting. Any vote may be taken by voice or by show of hands unless someone entitled to vote objects, in which case written ballots shall be used.

2.3   Action by Written Consent or Telephone Conference.

(a)   Any action required or permitted to be taken at any meeting of Members may be taken without a meeting without prior notice, and without a vote, if a consent or consents in writing setting forth the action so taken are signed by Members holding a majority of the Units.

(b)   Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

2.4   Majority.   With respect to any matter as to which this Agreement or applicable law provides for the vote, approval, consent of the Members, or other act by the Members with respect to such matter, the vote, approval, consent or other act of the Members with respect to such matter shall be effective only if the matter is approved at a meeting of the Members or if Members holding a majority of the Units execute a consent thereto in lieu of a meeting of the Members, except where this Agreement or applicable law requires a greater vote for the vote, approval, consent or other act of the Members.

2.5   Withdrawal/Expulsion.   The Company may not expel a Member, except that the Company may purchase all of the Units held by a Member (or the Member's personal representatives, heirs, distributees and transferees) if so agreed pursuant to this Agreement or another agreement between the Member and the Company. A Member may not withdraw from the Company except as permitted by this Agreement. Upon the transfer of all Units held by a Member in accordance with and as permitted by this Agreement, the transferor shall cease to be a Member.

2.6   Information.   Each Member shall provide to the Company the Member's federal taxpayer identification number, the Member's address and such other

CHEM/WIG 18239

information relating to the Member as the Company requests in connection with the Member's ownership of the Units held by the Member.

2.7    Amendment of Articles.  The Articles may be amended only by the act of the Members.

Article III
Managers

3.1    Management Powers.

(a)    Except as otherwise provided in this Agreement, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under, the Board of Managers.  In addition to the powers and authorities expressly conferred upon the Managers by applicable law or other provisions of this Agreement, the Board of Managers may exercise all such powers of the Company and do all such lawful acts and things as are not directed or required to be exercised or done by the Members by applicable law, the Articles or this Agreement.

(b)    In managing the business and affairs of the Company and exercising its powers, the Board of Managers shall act collectively through meetings, written consents in lieu of meetings or the execution by all of the Managers of any document pursuant to which the action is taken or effected.

(c)    With respect to any matter as to which this Agreement or applicable law provides for the vote, approval, consent of the Managers, or other act by the Managers with respect to such matter, and the vote, approval, consent or other act of the Managers with respect to any matter shall be effective if the matter is approved at a meeting of the Managers, or if all the Managers execute a consent thereto in lieu of a meeting of the Managers, in accordance with this Agreement, except where this Agreement or applicable law may provide for a greater vote, approval or consent of the Board of Managers.

3.2    Meetings.

(a)    Unless otherwise required by law or provided in the Articles or this Agreement, a majority of the total number of Managers fixed by, or in the manner provided in, the Articles or this Agreement shall constitute a quorum for the transaction of business of the Managers at any meeting of the Managers, and the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers.  A Manager who is present at a meeting of the Managers at which action on

CHEM/WIG 18240

any Company matter is taken shall be presumed to have assented to the action unless the Manager's dissent shall be entered in the minutes of the meeting or unless the Manager shall file a written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

(b)    Meetings of the Managers may be held at such place or places as shall be determined from time to time by resolution of the Managers. At all meetings of the Managers, business shall be transacted in such order as shall from time to time be determined by resolution of the Managers. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c)    Regular meetings of the Managers may be held at such times and places as shall be designated from time to time by resolution of the Managers. Notice of such regular meetings shall not be required.

(d)    Special meetings of the Managers may be called by any Manager on at least twenty-four hours notice to each other Manager.  The notice shall state the purpose or purposes of the meeting.

3.3    Approval or Ratification of Acts or Contracts by Members.  The Board of Managers in its discretion may submit any act or contract for approval or ratification at any meeting of the Members called for the purpose of considering any such act or contract, and any act or contract that is approved or ratified in good faith by the Members shall be as valid and as binding upon the Company and upon all the Members as if it shall have been approved or ratified by Members holding a majority of the Units.

3.4    Action by Written Consent or Telephone Conference.  Any action permitted or required by applicable law, the Articles or this Agreement to be taken at a meeting of the Managers or any committee designated by the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all the Managers or members of such committee, as the case may be. Such consent shall have the same force and effect as a unanimous vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of Nevada, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Managers or any such committee, as the case may be. Subject to the requirements of applicable law, the Articles or this Agreement for notice of meetings, unless otherwise restricted by the Articles, Managers, and members of any

CHEM/WIG 18241

committee designated by the Managers, may participate in and hold a meeting of the Managers or any committee of Managers, as the case may be, by means of all conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

3.5   Number. Unless and until changed, the number of Managers shall be the number set forth in the Articles as the number of Managers constituting the initial Managers. Managers needs not be residents of Nevada. The number of Managers may be increased or decreased from time to time by the Members and any decrease may shorten the term of any incumbent Manager as so designated by the Members.

3.6   Term. Each Manager shall hold office until such Manager's death, resignation or removal.

3.7   Removal. All or any of the Managers may be removed by the Members, with or without cause, by the Members. Any one or more of the Managers may be removed by the other Managers, with or without cause. The removal of a Manager shall be effective immediately, regardless of whether a successor Manager is elected simultaneously.

3.8   Vacancies. Any vacancy occurring in the Managers due to the death, resignation or removal of a Manager, or an increase in the number of Managers, may be filled by the Members.

## Article IV
### Issuance of Units

4.1   Units. Each initial Member shall contribute to the Company the following amount as the Member's Capital Contribution and the Company shall issue the following number of Units to the initial Member:

CHEM/WIG 18242

| Initial Member | Capital Contribution | Units |
|---|---|---|
| Jacobi | $8,500.00 | 170 |
| IES | $8,500.00 | 170 |
| WI | $33,000.00 | 660 |

Provided, however, that IES and WI shall contribute (in the ratio of IEC – 20% and WI – 80%) Jacobi's share of the initial Capital Contribution as a loan to Jacobi. The foregoing Capital Contribution shall be made upon the Company's request for such funds. The approval of not less than 80% of the Members shall be required for the Company to issue any Units in addition to the foregoing Units. The Members may authorize the Company to issue additional Units to any person, the Capital Contribution required in consideration of the issuance of the Units and any other terms and conditions of the issuance of the Units. Upon the issuance of one or more Units to a person as authorized by the Members, the person shall be admitted to the Company as a Member. The Board of Managers does not have the authority to issue additional Units.

    4.2    Additional Contributions. No Member shall be required to make any Capital Contribution to the Company beyond the amount the Member has agreed in writing to contribute; provided, however, that the Members may make additional Capital Contributions in their discretion. If the Members make additional Capital Contributions in proportion to their Sharing Ratios, the Company may but shall not be required to issue additional Units in connection with such additional Capital Contributions. No Member shall be obligated to make a loan to the Company. No Member shall be liable for any debts, obligations or liabilities of the Company. If less than all of the Members furnish additional funds to the Company, such funds shall be deemed to be furnished as a loan to the Company by the Member(s) furnishing the funds unless in consideration of the furnishing of the funds Members holding a majority of the Units authorize the issuance of additional units to the Member(s) contributing the additional funds. Unless otherwise provided in a promissory note or other instrument executed by the Company in connection with the loan, the loan shall be deemed to be payable upon the Member's demand and shall bear interest at a rate not to exceed the prime interest rate, or if lower, the maximum legal rate. The prime interest rate means the "prime rate" of interest as published on the date most recently preceding the date of the loan by *The Wall Street Journal* in its listing of "Money Rates." If that rate ceases to be available, the prime interest rate shall be a reasonably comparable rate to be determined by the Member making the loan.

CHEM/WIG 18243

4.3   Capital Accounts.  A capital account shall be established for each Member. The amount in a Member's capital account shall initially be the amount of the Member's initial Capital Contribution and shall be adjusted to reflect the Member's additional Capital Contributions, if any, the Member's distributive share of profit or loss of the Company, distributions made to the Member, and as otherwise provided in section 704 and any other applicable provision of the Code and reasonable accounting practices.

4.4   Interest/Withdrawal.  No Member shall be entitled to receive any interest on the Member's Capital Contribution.  No Member shall have the right to withdraw any part of the Member's Capital Contribution or to receive any return on the Member's Capital Contribution, except as may otherwise be specified in this Agreement.

4.5   Negative Capital Account.  No Member shall have any liability to the Company, any other Member or any other person for any negative balance in the Member's Capital Account, including such negative balance arising from any distributions made to the Member in accordance with this Agreement.

Article V
Allocations and Distributions

5.1   Allocations.

(a)   Except as may otherwise be required in paragraph 5.1(b) or other provisions of this Agreement, all items of income, gain, loss, deduction, and credit of the Company shall be allocated among the Members in accordance with their Sharing Ratios. For purposes of determining any of the foregoing Company items allocable to any period, such items shall be determined on a daily, semi-monthly, monthly or other basis, as determined by the Managers using any method permissible under section 706 of the Code.

(b)   If and to the extent required by section 704 and any other applicable provisions of the Code, the Managers shall specially allocate or adjust for Company items other than in accordance with the Members' Sharing Ratios. Such allocations and adjustments (the "Code Allocations") may include a minimum gain chargeback, qualified income offset, gross income allocation, Code section 754 adjustment or other type of adjustment or allocation. However, the Managers shall also make such further allocations or adjustments of Company items as may be necessary to prevent the Code Allocations from distorting the manner in which Company distributions are to be divided among the Members under paragraph 5.2. Without limiting the foregoing, upon liquidation of the Company the Managers shall make such allocations of Company items as will, to the extent possible, result in each Member's Capital Account having a positive balance (prior to liquidating distributions to the

CHEM/WIG 18244

Member) equal to the amount of distributions to be received by the Member pursuant to paragraph 5.2.

    5.2    Distributions. The Company may distribute cash and other property only upon approval of the Members. All distributions to the Members, including all liquidating distributions, shall be made in accordance with their Sharing Ratios, except that all distributions attributable to the Units originally issued to Jacobi (whether held by Jacobi or a permitted transferee of Jacobi) shall be made to IEC and WI in the ratio of 20% and 80%, respectively, until the such distributions repay all amounts loaned to Jacobi pursuant to paragraph 4.1.

**Article VI**
**Officers and Agents**

    6.1    Number; Qualification; Election; Term. The Company shall have: (a) a president and a secretary; and (b) such other officers and assistant officers and agents as the Members. Any two or more offices may be held by the same person. No officer or agent need be a Member, a Manager or a resident of Nevada. Additional officers and agents may be elected by the Members. Unless otherwise specified by the Members at the time of an officer's election or appointment, the officer shall serve until the end of the officer's term (if any such term has been specified by the Members) or, if earlier, until the officer's death, resignation or removal.

    6.2    Removal. Any officer or agent elected or appointed by the Members may be removed by the Members at will. No officer or agent shall have any contract rights with respect to the officer's or agent's employment by the Company unless set forth in a written document that has been approved by the Members. Election or appointment of an officer or agent shall not create any such contract rights.

    6.3    Vacancies. Any vacancy occurring in any office of the Company (by death, resignation, removal or otherwise) may be filled by the Members.

    6.4    Authority. Officers and agents shall have such authority and perform such duties in the management by the Company as provided in this Agreement or as may be determined by resolution of the Members not inconsistent with this Agreement.

    6.5    Compensation. The compensation of officers and agents shall be fixed or determined as prescribed from time to time by the Members.

    6.6    President. The president shall be the chief executive officer of the Company. The president shall preside at all meetings of the Members and the Managers, shall have general and active management of the business and affairs of the

CHEM/WIG 18245

Company, and shall see that all orders and resolutions of the Managers are carried into effect. The president shall perform such other duties and have such other authority and powers as the Members may, from time to time, prescribe.

6.7 <u>Secretary</u>. The secretary shall attend all meetings of the Managers and Members and record all votes, actions and minutes of all proceedings in a book to be kept for that purpose and shall perform similar duties for the executive and other committees when required. The secretary shall give, or cause to be given, notice of all meetings of the Members and special meetings of the Managers. The secretary shall keep in safe custody the seal of the Company and, when authorized by the Managers, affix it to any instrument requiring it. When so affixed, it shall be attested by the secretary's signature or by the signature of an assistant secretary. Furthermore, the secretary shall be under the supervision of the president and shall perform such other duties and have such other authority and powers as the Members may from time to time prescribe.

6.8 <u>Vice President</u>. If appointed or elected, a vice president shall, in the absence or disability of the president, perform the duties and have the authority and exercise the powers of the president. The vice president shall perform such other duties and have such other authority and powers as the Members may from time to time prescribe.

6.9 <u>Treasurer</u>. If appointed or elected, the treasurer shall have the custody of the Company's funds and securities, shall keep full and accurate accounts of receipts and disbursements of the Company, and shall deposit all funds and other valuables in the name and to the credit of the Company in depositories approved by the Members. The treasurer shall perform such other duties and have such other authority and powers as the Members may from time to time prescribe.

**Article VII**
<u>Restrictions on Transfer of Units</u>

7.1 <u>Restrictions</u>. Except as permitted in paragraph 7.2, prior to October 1, 2009, no Units or any interest therein may be transferred, whether voluntarily or involuntarily, by operation of law or otherwise, whether through a sale, gift, partition, pledge or otherwise, without the approval of the Members. The Members may grant or withhold their approval to a transfer in their sole and uncontrolled discretion. Any purported transfer of Units in violation of this Agreement shall be void.

7.2 <u>Permitted Transfers</u>. Subject to paragraph, Units held by a Member may be transferred without the consent of the Members:

CHEM/WIG 18246

(a)    to the personal representatives, heirs and distributees of the estate of Member following the death of the Member;

(b)    to the guardian of the estate of the Member following the judicially-determined incapacity of Member;

(c)    to the personal representatives, heirs, and distributees of the estate of the deceased spouse of Member following the termination of Member's marriage as the result of the death of the Member or the Member's spouse; and

(d)    to the Company pursuant to paragraph 7.5.

7.3    Further Requirements.  No purported transfer of Units shall be permitted or effective unless the Member or the transferee of the Units (or any spouse of transferee) executes such documents as the Company designates (and in the form and substance designated by the Company) to further evidence the applicability of this Agreement to the transferee (and the transferee's spouse) and to the Units transferred to the transferee.

7.4    Effect.  Upon the permitted transfer of a Unit to any person except the Company, the transferee of the Unit shall be admitted to the Company as a Member in substitution of the Member from whom the Units were transferred (to the extent of the Units transferred) and shall have all the rights, powers and privileges, and shall be subject to all obligations, of a Member under this Agreement.  By acquiring any Units, each Member assumes all obligations of a Member set forth in this Agreement.

7.5    Withdrawal.  Effective concurrently with this Agreement, the Company and Industrial Compounding, Inc. ("Manufacturer") entered into a Distributorship Agreement dated October 1, 2004 (the "Distributorship Agreement").  At any time after the termination of the term of Distributorship Agreement, but not before, a Member may withdraw from the Company by giving notice to the Company and the other Members.  Except as otherwise provided in paragraph 7.10 upon a Member's withdrawal the Company shall purchase from the withdrawing Member, and the withdrawing Member shall sell to the Company, all Units held by the Member at the purchase price specified below.

7.6    Indirect Transfers.  IES represents and warrants that on the date of this Agreement, Michael H. Williams ("Williams") is the sole member of IES. IES will not permit the membership interest owned by Williams in IES to be transferred, whether voluntarily or involuntarily, by operation of law or otherwise, whether through a sale, gift, partition, pledge or otherwise, unless such transfer is approved by the Members or unless the transfer is to a person or unless the transfer is:

CHEM/WIG 18247

      (a)   to the personal representatives, heirs and distributees of the estate of Williams following the death of Williams;

      (b)   to the guardian of the estate of Williams following the judicially-determined incapacity of Williams; and

      (c)   to the personal representatives, heirs, and distributees of the estate of the deceased spouse of Williams following the termination of Williams' marriage as the result of the death of Williams or Williams' spouse.

The Members may grant or withhold their approval to a transfer of the membership interests in IEC in their sole and uncontrolled discretion.

    7.7   <u>Book Value</u>.  The purchase price for the Units shall be the book value of the Units as of the end of the month immediately preceding the effective date of the Member's withdrawal (the "Valuation Date") as such value is determined by the Company. The book value shall be determined by the Company by: (a) dividing the excess, if any, of the value of the Company's assets, as reflected on the Company's books and records, over the amount of the Company's liabilities, as reflected on the Company's books and records, by the number of outstanding Units; and (b) by multiplying such result by the number of the Units held by the withdrawing Member. The value of the Company's assets, and the amount of the Company's liabilities, as reflected on the Company's books and records shall be determined in good faith by the Company without the necessity of an audit or review thereof by a certified public accountant or other person; provided, however, the Company may obtain the assistance of the Company's accountant in making the determination. In determining the book value of the Units, the Company shall use the same method of accounting as the Company uses for federal income tax purposes, except that the Company may also annualize expenses and liabilities that are attributable to the Company's operations over a period of twelve months and may prorate them to the Valuation Date. Those expenses and liabilities include, without limitation, depreciation, amortization, compensation bonuses, deferred compensation, and corporate income and franchise taxes. The Company's determination of the book value of the Units, if made in good faith, shall be binding and conclusive on all persons.

    7.8   <u>Payment</u>.  The Company shall pay the purchase price for the Units to the withdrawing Member as follows: twenty percent of the purchase price shall be paid in via the Company's check delivered at the closing and the balance shall be paid in four equal annual installments beginning one year from the date of closing.

CHEM/WIG 18248

7.9    Closing.  The closing of the sale and purchase of the Units arising from a Member's withdrawal shall occur within twenty days after the book value of the Units is determined in accordance with the foregoing provisions.  The Company shall determine the book value of the Units not later than sixty days after receipt of the Member's notice of withdrawal and shall notify all Members of the book value as so determined.  The closing shall occur at the principal office of the Company in Tarrant County, Texas.

7.10    Election to Dissolve.

(a)    Notwithstanding paragraph 7.5, if a Member notifies the Company of the Member's withdrawal, and if other Members holding a majority of the Units held by the other Members elect to dissolve the Company within thirty days after the withdrawing Member's notice, the provisions of paragraph 7.5 shall not be applicable. Instead, the Company shall be dissolved and its affairs wound up as provided by applicable law and the Members (including the Member who gave notice of withdrawal) shall receive their prorata share of any liquidating distributions from the Company in accordance with their Sharing Ratios.

7.11    Certificates.    The Company may issue certificates representing and evidencing Units.  Any such certificate shall state on its face the Member's name, the number and class of Units, and such other matters as the Company may specify, including a legend reflecting the restrictions on the transferability of the Units.

### Article VIII
### Restrictive Covenants

8.1    Definitions.

(a)    Capitalized terms used in this Agreement and not otherwise defined in this Agreement have the meaning specified for such terms in the Distributorship Agreement.

(b)    IES agrees that during the term of the Distributorship Agreement, neither IES nor an affiliate of IES will, directly or indirectly:

(i)    for itself or in a representative capacity, sell a Frac Chemical to any person located in the National Territory or ship a Frac Chemical to any location in the National Territory except to Manufacturer;

(ii)    for itself or in a representative capacity, sell a Production Chemical to any person located in the North Texas Territory or ship a Production

CHEM/WIG 18249

Chemical to any location in the North Texas Territory except to Manufacturer if during the month such sale or shipment is made the Company is the exclusive distributor for Production Chemicals under the Distributorship Agreement;

(iii)    have an interest in, whether as owner, partner, shareholder, member or otherwise, a business that sells a Frac Chemical to any person located in the National Territory or ship a Frac Chemical to any location in the National Territory except to Manufacturer; or

(iv)    have an interest in, whether as owner, partner, shareholder, member or otherwise, a business that sells a Production Chemical to any person located in the North Texas Territory or ship a Production Chemical to any location in the North Texas Territory except to Manufacturer if during the month such sale or shipment is made the Company is the exclusive distributor for Production Chemicals under the Distributorship Agreement;

provided, however, that IES's ownership of an aggregate of less than 5% of the total outstanding equity securities of any entity whose equity securities are registered pursuant to the Securities Exchange Act of 1934 and publicly traded on a recognized exchange or in the over-the-counter market shall not constitute a violation of this paragraph 8.1(a)(iii) or paragraph 8.1(a)(iv).

8.2    <u>Jacobi Restrictions</u>.

(a)    Jacobi agrees that during the period that Jacobi is a Member and for a period of two years thereafter, Jacobi will not, directly or indirectly:

(i)    for himself or in a representative capacity, render services to any business that sells Frac Chemicals anywhere in the National Territory or sells Production Chemicals anywhere in the North Texas Territory; or

(ii)    engage in or have an interest in, whether as owner, partner, shareholder, member or otherwise, a business that sells Frac Chemicals anywhere in the National Territory or sells Production Chemicals anywhere in the North Texas Territory; provided, however, that Jacobi's ownership of an aggregate of less than 5% of the total outstanding equity securities of any entity whose equity securities are registered pursuant to the Securities Exchange Act of 1934 and publicly traded on a recognized exchange or in the over-the-counter market shall not constitute a violation of this paragraph 8.2(a)(ii).

CHEM/WIG 18250

8.3   <u>Continuing Effect</u>.  A Member's cessation of ownership of Units shall not affect the person's obligations under this Article VIII after such person ceases to be a Member.

8.4   <u>Enforcement</u>.  A Member's covenants in this Article shall be specifically enforceable and the term of the covenants shall be tolled during any period of violation thereof by a Member.

## Article IX
## Dissolution and Termination

9.1   <u>Dissolution</u>.  The Company shall dissolve on the first to occur of the following:

(a)   the approval of the Members; or

(b)   the occurrence of any other event that pursuant to applicable law dissolves the Company.

The death, withdrawal, expulsion, judicial determination of incapacity, or bankruptcy of a Member, or the dissolution, or other cessation of existence of a Member, shall not dissolve the Company.

9.2   <u>Termination</u>.  On dissolution of the Company the Company shall wind up its affairs as provided by applicable law.

## Article X
## Miscellaneous Provisions

10.1   <u>Amendment</u>.  The Agreement may be amended only by a written instrument signed by all of the Members

10.2   <u>Number/Gender</u>.  Where the context so indicates, the singular shall include the plural, the use of any gender shall include all other genders.

10.3   <u>Binding Effect</u>.  These Regulations shall be binding upon and shall inure to the benefit of the Members and their respective successors and permitted assigns.

10.4   <u>Severability</u>.  No partial invalidity of this Agreement shall affect the remainder.

CHEM/WIG 18251

10.5   Attorney's Fees.   The prevailing party in any suit brought to enforce or interpret this Agreement shall be entitled to recover the party's reasonable attorneys fees and court and other costs in addition to any other relief awarded.

10.6   Waiver.   The failure of a party to enforce any provision of this Agreement shall not constitute a waiver of such party's right to thereafter enforce such provision or to enforce any other provision at any time.

10.7   Modification.   This Agreement cannot be modified except by a written instrument signed by the party to be charged with the modification.

10.8   Successors/Assigns.   This Agreement shall be binding upon and shall inure to the benefit of each party's successors and assigns.

CHEM/WIG 18252

CHEM SOURCE, LLC

By: _____
Joseph E. Jacobi, President

INDUSTRIAL ENVIRONMENTAL
SERVICES, LLC

By: _____
Michael E. Williams, President

WORLD INVESTMENT GROUP, LLC

By: _____
Dan Wilks, Manager

_____
Joseph E. Jacobi

0710&.003/005.102956

Page 17

CHEM/WIG 18253